**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL PARTNERS FOR ETHICAL CARE INC; ADVOCATES PROTECTING CHILDREN; PARENT 1A; PARENT 1B; PARENT 2A; PARENT 2B; PARENT 3A; PARENT 3B; PARENT 4A; PARENT 4B; PARENT 5A; PARENT 5B, | No. 24-3661 <br><br> D.C. No. 3:23-cv-05736-DGE |
| *Plaintiffs - Appellants*, | |
| v. | OPINION |
| ROBERT FERGUSON, Governor; NICK BROWN, Attorney General of Washington; TANA SENN, Secretary of the Washington Department of Children, Youth, and Families,* | |
| *Defendants - Appellees*. | |

---

* Pursuant to Fed. R. App. P. 43(c)(2), Robert Ferguson, Nick Brown, and Tana Senn have been automatically substituted for their predecessors—Jay Inslee, Robert Ferguson, and Ross Hunter, respectively.

2    INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, District Judge, Presiding

Argued and Submitted May 15, 2025
San Francisco, California

Filed July 25, 2025

Before: SIDNEY R. THOMAS, MILAN D. SMITH, JR.,
and DANIEL A. BRESS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[**]

**Article III Standing**

The panel affirmed the district court's dismissal, for lack
of Article III standing, of an action challenging three
Washington laws regulating the rights and privileges of
Washington minors seeking access to mental health care and
shelter services, particularly minors who are transgender.

The panel held that plaintiffs, two national organizations
and five sets of parents whose children have shown signs of
gender dysphoria, had not pled current or future injuries
sufficient to confer standing.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

First, the panel held that the individual plaintiffs lacked standing based on current injuries because the individual plaintiffs' alleged injuries in constraining their ability to parent, forcing them to censor their speech, and limiting their access to relevant information about their children are not cognizable under Article III.

Second, the panel held that the individual plaintiffs lacked standing based on future injuries. The panel rejected the individual plaintiffs' suggestion that, because they have minor children who experience gender dysphoria and socially transitioned at school, "one may infer that at least one child is likely to run away in the future" and therefore come within reach of the challenged laws. The panel held that the individual plaintiffs' amorphous and insufficiently explained concerns about "some day" injuries were not enough to satisfy Article III.

Finally, the panel held that the organizational plaintiffs lacked standing. For the same reasons that the individual plaintiffs lacked standing, the panel rejected plaintiffs' argument that International Partners for Ethical Care, Inc. had associational standing based on the alleged injury suffered by one of its members, a Washington parent of a minor child who has struggled with gender dysphoria. Plaintiffs offered no assertion that the other organizational plaintiff had any type of standing.

Accordingly, the panel affirmed the district court's dismissal of plaintiffs' action for lack of standing.

## COUNSEL

Gene C. Schaerr (argued) and Edward H. Trent, Schaerr
Jaffe LLP, Washington, D.C.; Jonathan F. Mitchell, Mitchell
Law PLLC, Austin, Texas; James K. Rogers, Nicholas
Barry, and Ian Prior, America First Legal Foundation,
Washington, D.C.; for Plaintiffs-Appellants.

Cristina Sepe (argued) and Marsha J. Chien, Deputy
Solicitors General; Robert W. Ferguson, Attorney General;
Office of the Washington Attorney General, Olympia,
Washington; Andrew R.W. Hughes, and Lauryn K. Fraas,
Assistant Attorneys General; Office of the Washington
Attorney General, Seattle, Washington; for Defendants-
Appellees.

Eric A. Sell, Harmeet K. Dhillon, Mark Trammell, and Josh
W. Dixon, Center for American Liberty, Mount Airy,
Maryland, for Amicus Curiae the Center for American
Liberty.

Jennifer W. Kennedy, Law Office of Jennifer W. Kennedy,
Sierra Madre, California, for Amicus Curiae Our Duty-USA.

Isaac Ruiz and McKean J. Evans, Ruiz & Smart LLP,
Seattle, Washington, for Amicus Curiae Legal Counsel for
Youth and Children.

INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON          5

**OPINION**

M. SMITH, Circuit Judge:

Plaintiffs, two national organizations and five sets of Washington parents, bring constitutional challenges against three Washington laws regulating the rights and privileges of Washington minors, particularly minors who are transgender. The district court dismissed Plaintiffs' claims for lack of standing. Plaintiffs timely appeal, contending that they have standing based on present injuries and future injuries that are certainly impending. We conclude, like the district court, that Plaintiffs have not pled current or future injuries sufficient to confer Article III standing. Because Plaintiffs lack standing until actual or imminent injuries occur, we affirm the district court's dismissal of their action.

**LEGAL BACKGROUND**

Plaintiffs challenge the constitutionality of three Washington laws: (1) Wash. Rev. Code § 71.34.530, (2) Engrossed Substitute Senate Bill 5599 (ESSB 5599), and (3) Substitute House Bill 1406 (SHB 1406) (collectively, the Statutes). The effect of these laws is summarized briefly here.

**I. Wash. Rev. Code § 71.34.530**

Enacted in 1985, Wash. Rev. Code § 71.34.530 was passed as part of a comprehensive law "ensur[ing] that minors in need of mental health care and treatment receive appropriate care and treatment." 1985 Wash. Sess. Laws, ch. 354, § 1. It provides that any minor aged 13 and older "may request and receive outpatient treatment without the consent of the adolescent's parent." Wash. Rev. Code § 71.34.530. Outpatient treatment includes non-residential

programs offering, *inter alia*, mental and behavioral health care. *Id.* §§ 71.34.020(46), 71.24.025.

Even if children receive outpatient treatment without parental consent, their parents may still access information about their care. For example, Washington law provides that facilities offering mental health services may release medical information and records about a child to that child's parents. *Id.* §§ 70.02.240(3), 71.34.430. Nevertheless, "[w]hen an adolescent voluntarily consents to his or her own mental health treatment under . . . [§] 71.34.530, a mental health professional shall not proactively exercise his or her discretion . . . to release information or records related to solely mental health services received by the adolescent to a parent of the adolescent, beyond any notification required under [Washington law], unless the adolescent states a clear desire to do so[.]" *Id.* § 70.02.265(1)(a).

## II. ESSB 5599

Enacted in 2023, ESSB 5599 approved a set of amendments to Wash. Rev. Code § 13.32A.082. 2023 Wash. Legis. Serv., ch. 408, § 2 (West). That law, which was enacted in 1995, sets forth a system of notification requirements that apply when a licensed youth shelter "shelters a child and knows at the time of providing the shelter that the child is away from a lawfully prescribed residence or home without parental permission." Wash. Rev. Code § 13.32A.082(1)(b)(i).[1] Upon admitting such a child, the shelter "must contact the youth's parent within 72

---

[1] Wash. Rev. Code § 13.32A.082 also contains separate provisions that apply to people, unlicensed shelters, and other programs that take in runaway children. *See* Wash. Rev. Code § 13.32A.082(1)(a). Those provisions are not at issue here.

hours, but preferably within 24 hours." *Id.*[2] However, in the presence of "compelling reasons," including any "[c]ircumstances that indicate that notifying the parent or legal guardian will subject the minor to abuse or neglect," the shelter may forego contacting the child's parents and contact the Washington Department of Children, Youth, and Families (DCYF) instead. *Id.* § 13.32A.082(1)(b)(i), (2)(c)(i). Upon contact, DCYF must "make a good faith attempt to notify the parent that a report has been received and offer services to the youth and the family designed to resolve the conflict . . . and accomplish a reunification of the family." *Id.* § 13.32A.082(3)(a).

ESSB 5599 adds to this framework by creating a notification pathway that is specific to youth "seeking or receiving protected health care services," including "gender-affirming treatment" and "reproductive health care services." *Id.* § 13.32A.082(2)(c)(ii), (2)(d).[3] Under the existing framework set forth in Wash. Rev. Code § 13.32A.082, licensed shelters that took in such children were obligated to notify their parents so long as doing so would not "subject the minor to abuse or neglect." *Id.*

---

[2] This notification "must include the whereabouts of the youth, a description of the youth's physical and emotional condition, and the circumstances surrounding the youth's contact with the shelter." Wash. Rev. Code § 13.32A.082(1)(b)(i).

[3] Washington law defines "gender-affirming treatment" as "a service or product that a health care provider . . . prescribes to an individual to support and affirm the individual's gender identity." Wash. Rev. Code § 74.09.675(3). It defines "reproductive health care services" as "any medical services or treatments, including pharmaceutical and preventive care service or treatments, directly involved in the reproductive system and its processes, functions, and organs involved in reproduction, in all stages of life." *Id.* § 74.09.875(4)(c).

§ 13.32A.082(2)(c)(i).  ESSB 5599 modifies this framework by providing that the fact of a child's "seeking or receiving protected health care services" creates an additional instance in which the shelter's obligation to notify the child's parents is voided.  *Id.* § 13.32A.082(2)(c)(ii).  In these situations, as when the shelter fears potential abuse or neglect by the child's parents, the shelter may again forego contacting the child's parents and contact DCYF instead.  *Id.* § 13.32A.082(1)(b)(i), (2)(c)(ii)

As in a case involving potential abuse or neglect, a licensed shelter's report to DCYF will again trigger DCYF's good-faith obligation "to notify the parent that a report has been received and offer services to the youth and the family designed to resolve the conflict . . . and accomplish a reunification of the family." *Id.* § 13.32A.082(3)(a).  ESSB 5599 further specifies that, if a licensed shelter notifies DCYF that it has taken in a minor seeking or receiving "protected health care services," DCYF must specifically offer two types of services.  First, DCYF must "[o]ffer to make referrals on behalf of the minor for appropriate behavioral health services." *Id.* § 13.32A.082(3)(b)(i). Second, DCYF must "[o]ffer services designed to resolve the conflict and accomplish a reunification of the family." *Id.* § 13.32A.082(3)(b)(ii).

### III.  SHB 1406

Enacted during the same session as ESSB 5599, SHB 1406 implements two additional revisions to the framework set forth in Wash. Rev. Code § 13.32A.082.  2023 Wash. Legis. Serv., ch. 151, § 2 (West).  First, it creates additional rules concerning DCYF's good-faith obligation to notify a child's parents and offer services after receiving a report of a runaway child.  Wash. Rev. Code § 13.32A.082(3)(a).

INT'L PARTNERS FOR ETHICAL CARE, INC v. FERGUSON       9

Specifically, in addition to "notify[ing] the parent that a report has been received," *id.*, DCYF must offer "family reconciliation services," *id.*, which are "services . . . designed to assess and stabilize the family with the goal of resolving crisis and building supports, skills, and connection to community networks and resources," *id.* § 13.32A.030(11). DCYF must offer these services "as soon as possible, but no later than three days, excluding weekends and holidays, following the receipt of a report." *Id.* § 13.32A.082(3)(a).

Second, SHB 1406 expressly recognizes a pathway for qualifying minors to stay in a licensed shelter for up to 90 days without parental permission. *See id.* § 13.32A.082(1)(b)(i). This pathway is only available in two situations: (1) if the shelter "is unable to make contact with a parent despite their notification efforts" to the parent or DCYF, *id.* § 13.32A.082(1)(b)(i)(A), or (2) if the shelter "makes contact with a parent, but the parent does not request that the child return home," *id.* § 13.32A.082(1)(b)(i)(B). In either scenario, the shelter must re-contact DCYF, which again must offer reconciliation services to the family. *Id.* § 13.32A.082(3).

## FACTUAL BACKGROUND

Plaintiffs are two organizations and five sets of parents that have challenged the Statutes as unconstitutional. The organizations—International Partners for Ethical Care, Inc. (IPEC) and Advocates Protecting Children (APC) (collectively, the Organizational Plaintiffs)—are national nonprofits that share a commitment to "stop[ping] the unethical treatment of children by schools, hospitals, and mental and medical healthcare providers under the duplicitous banner of gender identity affirmation." The

10    INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON

parents—1A and 1B, 2A and 2B, 3A and 3B, 4A and 4B,
and 5A and 5B (collectively, the Individual Plaintiffs[4])—are
residents or citizens of Washington whose children have
shown signs of gender dysphoria.[5] Their experiences are
summarized briefly here.[6]

Parents 1A and 1B have a 14-year-old child, 1C, who has
shown signs of gender dysphoria. After 1C underwent a
social transition at school, 1A and 1B sought treatment for
1C and removed 1C from school. These actions caused 1C's
"gender confusion [to] ease[] some." Yet 1A and 1B remain
"concerned" that 1C will again seek to "adopt a gender
identi[t]y inconsistent with [1C's] biological sex." They
"fear" that 1C may seek to take advantage of the framework
set forth in the Statutes and worry that "[i]f 1C were to run
away, the [Statutes] would greatly harm [their] ability to care
for and raise" 1C. This concern has made 1A "hesitant to
discipline 1C for fear it will cause a rift that others might
take advantage of."

Parents 2A and 2B have two children—an 18-year-old,
2C, and a 13-year-old, 2D—who have shown signs of gender
dysphoria. 2C, who has accused 2A and 2B of being

---

[4] Due to the sensitivity of the Individual Plaintiffs' experiences and
claims, the district court granted their motion to proceed using
pseudonyms.

[5] 4A and 4B are the only Individual Plaintiffs whose children have not
shown signs of gender dysphoria. Presumably for this reason, Plaintiffs
do not pursue the claims of 4A and 4B on appeal. We follow Plaintiffs'
lead in focusing on the claims of the other Individual Plaintiffs.

[6] This section is based on the allegations in the First Amended Complaint
(FAC). Because the procedural posture is that of a motion to dismiss,
the allegations in the FAC are accepted as true. *Ashcroft v. Iqbal*, 556
U.S. 662, 678 (2008).

"transphobic," has threatened to take 2D, who underwent a social transition at school, to a "safe place" where 2D's pronouns would be respected. This causes 2A and 2B to become fearful every time 2D leaves their home with 2C. To avoid exacerbating tensions with their children, 2A and 2B have begun to avoid talking about gender around 2C and 2D, and 2A has also ceased using 2D's name or pronouns in public settings. 2A and 2B worry that, "should [2D] run away to a shelter," their parental rights would be limited.

Parents 3A and 3B have a 14-year-old child, 3C, who is autistic and has shown signs of gender dysphoria. 3C has "experiment[ed] with a new name and . . . pronouns with friends and at school," and is "frequently ambivalent about . . . gender." When 3C's older brother experienced similar signs of gender confusion, "a friend's family encouraged [him] to run away and live with them." 3A and 3B fear that 3C may similarly be encouraged to run away and worry that, if 3C does, the Statutes will "force[] [them] to accept 'gender-affirming treatment' for" 3C.

Finally, Parents 5A and 5B have a 15-year-old child, 5C, who has shown signs of gender dysphoria. 5C's symptoms came on "rapid[ly]" at age 12, and 5C later underwent a social transition at school without 5A and 5B's knowledge. 5C continues to identify as "transgender" at school and has "had conversations with numerous therapists and behavioral health specialists about gender identity and 'transitioning.'" Because 5C ran away from home once at age 13, and because 5C has since had "hospitalizations" about which 5A and 5B have limited information, 5A and 5B worry that 5C will run away again and will rely on the Statutes to seek gender-affirming care.

## PROCEDURAL BACKGROUND

Plaintiffs first filed suit in August 2023, challenging ESSB 5599 on a facial basis. Their complaint named as defendants former Washington Governor Jay Inslee, former Washington Attorney General Robert Ferguson, and DCYF Secretary Ross Hunter, all in their official capacities (collectively, the State). The State moved to dismiss for lack of standing, and Plaintiffs responded by amending their complaint as of right pursuant to Fed. R. Civ. P. 15(a)(1)(B). Their First Amended Complaint (FAC) added a new set of parents—Parents 5A and 5B—and new challenges to SHB 1406 and Wash. Rev. Code § 71.34.530. The FAC asserts claims under the Due Process Clause, the Free Exercise Clause, and the Free Speech Clause.

In December 2023, Defendants again moved to dismiss for lack of standing. This time, Plaintiffs did not seek to amend the FAC, and the district court proceeded to evaluate the merits of the motion. It found that Plaintiffs' alleged harms were based on a "speculative chain of possibilities." The district court thus held that the Individual Plaintiffs had not suffered concrete injuries sufficient to confer standing. The district court similarly concluded that the Organizational Plaintiffs had not sufficiently alleged organizational standing. The district court dismissed the action with prejudice for lack of standing and entered final judgment.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. *Meland v. Weber*, 2 F.4th 838, 843 (9th Cir. 2021). "We review questions of standing de novo," *Tyler v. Cuomo*, 236 F.3d 1124, 1131 (9th Cir. 2000), construing "all material allegations of fact in the complaint in favor of the plaintiff,"

INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON    13

*Southcentral Found. v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 416–17 (9th Cir. 2020).

## ANALYSIS

The sole question we must resolve on appeal is whether Plaintiffs have standing to bring their claims. To establish Article III standing, a plaintiff must show that he has suffered or will imminently suffer an injury in fact, i.e., "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). A plaintiff must further demonstrate causation and redressability by showing "that the injury likely was caused or will be caused by the defendant, and . . . that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 368, 380 (2024).

The district court dismissed Plaintiffs' claims for lack of standing, specifically concluding that Plaintiffs had not demonstrated a cognizable injury in fact. Plaintiffs contest this conclusion, arguing that they can demonstrate three independent and legally sufficient types of injuries. First, Plaintiffs contend that some or all of the Individual Plaintiffs are suffering current injuries. Second, Plaintiffs contend that some or all of the Individual Plaintiffs are likely to suffer future injuries that are certainly impending. Finally, Plaintiffs contend that IPEC, one of the Organizational Plaintiffs, has associational standing based on the claims of its member. For the following reasons, we conclude that Plaintiffs are unable to muster standing under any of these theories.

## I. The Individual Plaintiffs Lack Standing Based on Current Injuries.

Plaintiffs first contend that some or all of the Individual Plaintiffs have standing based on current injuries. They point to three types of injuries: constraints on their ability to parent, censored speech, and restrictions on access to information about their children. The State responds that these injuries are not cognizable under Article III. Construing the allegations in the FAC in favor of Plaintiffs, *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988), we agree with the State that Plaintiffs' alleged injuries are not cognizable.

### a. Constraints on Parenting

Plaintiffs first argue that the Statutes have injured the Individual Plaintiffs by forcing them to alter their parenting styles. This injury is most pertinent to Parents 1A and 1B. Fearing that their child, 1C, may run away to seek gender-affirming care, 1A and 1B are "hesitant to discipline 1C" because they do not wish to give 1C any reason to leave home. This tension further leaves 1A "uncomfortable every time she has a disagreement with 1C." Plaintiffs argue that these types of parenting-related difficulties are practical injuries that the Individual Plaintiffs have suffered due to the Statutes.

These injuries are not sufficient to confer standing. As noted, Article III standing requires that a plaintiff present an "actual or imminent" injury that is fairly traceable to the defendant's conduct. *Lujan*, 504 U.S. at 560 (quoting *Whitmore*, 495 U.S. at 155). As a corollary, a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l*

INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON      15

*USA*, 568 U.S. 398, 416 (2013). Stated another way, "[n]o [plaintiff] can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam); *see also Nat'l Family Plan. & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III."); *Iten v. Los Angeles*, 81 F.4th 979, 990 n.1 (9th Cir. 2023).

Damages "inflicted by [their] own hand" are precisely what Plaintiffs offer here. *Pennsylvania*, 426 U.S. at 664. Critically, Plaintiffs do not allege that their or their children's behavior has yet brought them within reach of the Statutes. Instead, they allege only that the looming "threat" imposed by the Statutes has led them to alter their parenting styles so that the Statutes cannot affect them. Such injuries are self-inflicted because they are the result of "voluntary" actions that Plaintiffs have taken "in response to" the Statutes—not because of any actual requirement that the Statutes impose. *See Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022) (finding that the plaintiff lacked standing because the only injuries it suffered were voluntarily "taken in response to" the challenged action); *see also Maryland v. Louisiana*, 451 U.S. 725, 742 n.18 (1981) (affirming that standing does not arise from an "injury [that] was voluntarily suffered"). As a result, Plaintiffs' alleged injuries do not give rise to standing. *Lujan*, 504 U.S. at 560.

### b. Censored Speech

Plaintiffs next argue that the Statutes have injured the Individual Plaintiffs by forcing them to censor their speech. This injury is most pertinent to Parents 2A and 2B. Fearing

that their children may run away if angered or confronted about their gender dysphoria, 2A and 2B have stopped talking about gender with or in front of their children. Similarly, 2A no longer uses 2D's given name or pronouns in public settings in order to avoid upsetting 2D. In these ways, 2A and 2B have "suppress[ed] [their] own speech in an effort to avoid the consequences of the challenged provisions."

Self-censorship may give rise to standing when it is based on "an actual and well-founded fear that the law will be enforced against [the plaintiff]." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *see also Clapper*, 568 U.S. at 417–18; *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). However, "such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003); *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003); *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965).

Plaintiffs cannot make this showing with respect to the Statutes because the Statutes do not regulate speech: They set forth rules and systems pertaining to the rights and privileges of Washington minors, and they have no bearing on whether and to what extent Plaintiffs are permitted to speak about topics, such as gender, with or around their children. This distinction separates Plaintiffs from those individuals that have been permitted to "hold [their] tongue[s] and challenge now." *Ariz. Right to Life*, 320 F.3d at 1006. Whereas those individuals sought to challenge regulations under which they would suffer likely prosecution, Plaintiffs cannot "reasonably fear[] prosecution under [the Statutes] for engaging in protected speech" because the Statutes do not regulate or prosecute speech. *Id.*

INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON     17

*at* 1007.  As a result, Plaintiffs lack "an actual and well-founded fear that [the Statutes] will be enforced against [them]," and they have accordingly not "suffered the constitutionally recognized injury of self-censorship." *Cal. Pro-Life Council*, 328 F.3d at 1095 (quoting *Virginia*, 484 U.S. at 393); *see Clapper*, 568 U.S. at 417–18.

### c.  Limited Access to Information

Plaintiffs finally argue that the Statutes have injured the Individual Plaintiffs by limiting their access to relevant information about their children.  Plaintiffs focus on two specific harms that are alleged in the FAC.

The first alleged harm concerns efforts by the schools of Plaintiffs' children to facilitate social transitions or provide gender-related counseling without notice to parents.  For example, 1C's school helped 1C to "socially 'transition'" 1C without providing prior notice to 1A and 1B.  5C's school, similarly, did not consult 5A and 5B before providing 5C with a "school counselor" to discuss transitioning.  Plaintiffs argue that these schools' refusal to seek consent or provide up-to-date information relating to their children's gender has "undermine[d] [their] ability to raise their children," thereby imposing injury.  But as alleged in the FAC, these incidents bear no relation to the Statutes, which do not regulate the conduct of public schools.  As a result, these incidents are neither "fairly traceable to [the State's] allegedly unlawful conduct [nor] likely to be redressed by [Plaintiffs'] requested relief"—a declaration that the Statutes are unconstitutional and an injunction preventing their enforcement.  *Allen v. Wright*, 468 U.S. 737, 751 (1984).  These gaps are fatal to standing.  *See id.*

Plaintiffs also point to the fact, as alleged in the FAC, that 5C has had "hospitalizations, but has refused to talk to

5A and 5B about the details." Plaintiffs assert that 5C was permitted to "ke[ep] [5A and 5B] in the dark" due to Wash. Rev. Code § 71.34.530, the law that authorizes minors to receive outpatient mental health treatment without parental approval. But Wash. Rev. Code § 71.34.530 does not regulate parental access to medical records, and other provisions that do, such as Wash. Rev. Code § 70.02.240, are not challenged in the FAC. Further, the FAC lacks allegations connecting 5A and 5B's alleged injury to this statutory framework. Notably, it does not allege that 5C's hospitalizations were for outpatient mental or behavioral health treatment, that 5A and 5B declined to authorize that treatment, or that 5A and 5B sought information from 5C's medical providers. *See* Wash. Rev. Code § 71.34.530. Without those allegations, the FAC fails to tie 5A and 5C's alleged injury to any of the challenged provisions of Washington law.

## II. The Individual Plaintiffs Lack Standing Based on Future Injuries.

Plaintiffs further contend that even if the Individual Plaintiffs have not suffered cognizable current injuries, they still have standing to sue based on their likelihood of being injured in the future. This argument turns on the factual circumstances presented by the Individual Plaintiffs. Plaintiffs suggest that, because they have minor children who experience gender dysphoria and socially transitioned at school, "one may infer that at least one child is likely to run away in the future" and therefore come within reach of the Statutes.

Plaintiffs' argument distills to the suggestion that, because Plaintiffs may someday be affected by the Statutes, Plaintiffs should have standing to challenge the Statutes

INT'L PARTNERS FOR ETHICAL CARE, INC V. FERGUSON      19

now. A similar argument was put forward in *Lujan*. There, environmental organizations sought to challenge a regulation that limited the geographic scope of the Endangered Species Act's consultation requirements. *Lujan*, 504 U.S. at 557–58. The organizations conceded that they were not directly subject to the regulation, but they insisted that it would harm their members through a tenuous casual pathway: Because "the lack of consultation . . . [would] 'increas[e] the rate of extinction of endangered and threatened species,'" members of the organizations who "inten[ded]" to travel the world and appreciate animal diversity would someday be "deprived of the opportunity to observe animals of the endangered species" that the regulation adversely affected. *Id.* at 562–64.

The Supreme Court rejected this attempt to contrive a future injury. It explained that, in the absence of a present injury, plaintiffs may satisfy standing by showing that they face a future injury that is "imminent," or "*certainly* impending." *Id.* at 561, 564 n.2 (quoting *Whitmore*, 495 U.S. at 158). But it found that the "imminence" requirement "ha[d] been stretched beyond the breaking point" in the case of the organizational plaintiffs because they "allege[d] only an injury at some indefinite future time, and the acts necessary to make the injury happen [we]re at least partly within the [organizations'] own control." *Id.* at 564 n.2. The Court noted, for example, that standing would require the organizations to show "not only that listed species were in fact being threatened by funded activities abroad, but also that one or more of [the] members would thereby be 'directly' affected[.]" *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). In the absence of that showing, the Court held that the organizations' "'some day' intentions—without any description of concrete plans, or

indeed even any specification of *when* the some day w[ould] be—d[id] not support a finding of the 'actual or imminent' injury that [Article III] require[s]." *Id.* at 564.

Plaintiffs' situation is analogous. They contend that, "[g]iven that there are at least four gender-dysphoric minors represented by the parent Plaintiffs," "there is a credible likelihood that at least one of the parent Plaintiffs' children will run away to a shelter and thus trigger the [Statutes]." But as the district court found, Plaintiffs' claims rely on an enormity of "ifs" and "shoulds," without any detail or explanation as to when or why these contingencies might occur. For example, 3A and 3B worry that "[i]f 3C were to run away and receive counseling to affirm a 'transgender identity,' or receive medical 'treatment' to . . . look more like" the opposite sex, they would fall within the reach of the Statutes and be adversely impacted. But Plaintiffs present no allegation that 3C is transgender, has sought gender-affirming treatment, or has expressed an interest in running away. In the absence of those details, like the plaintiff organizations in *Lujan*, Plaintiffs' amorphous and insufficiently explained concerns about "some day" injuries are "simply not enough" to satisfy Article III. *See id.*

Plaintiffs' attempt to demonstrate future injury is made more difficult by the complicated and specific pathway that is necessary to trigger the Statutes. In *Lujan*, for example, the Court found that the organizational plaintiffs would come into contact with the challenged regulations if two events occurred: (1) the regulations threatened endangered species, and (2) that threat directly affected organizational members. *Id.* at 563. Here, by contrast, Plaintiffs will come into contact with the Statutes only if a more convoluted series of events transpires: (1) one of the Individual Plaintiffs' minor children (2) runs away (3) to a licensed

shelter (4) while actively seeking or receiving gender-affirming care, resulting in (5) the shelter taking in the child (6) despite knowing that the minor is there without parental permission. *See* Wash. Rev. Code § 13.32A.082(1)(b)(i). Plaintiffs do not allege that these events have transpired, and they fail to provide "concrete" details or "specification of *when*" they might occur. *Lujan*, 504 U.S. at 564.[7] Thus, considered in light of the complex statutory scheme they challenge, Plaintiffs' basic "[a]llegations of *possible* future injury" are especially insufficient. *Clapper*, 568 U.S. at 409 (alteration in original) (quoting *Whitmore*, 495 U.S. at 158).

Plaintiffs attempt to counter this result with three different arguments, but none is persuasive. They first argue that, even if their prospect of future injury remains uncertain, the Statutes have already harmed them by increasing the likelihood that they will suffer some injury in the future. Relying on the concept of a "probabilistic harm"—the idea that "[e]ven a small probability of injury is sufficient to create a case or controversy"—Plaintiffs assert that they have demonstrated a sufficient probability of harm to satisfy standing here. *Massachusetts v. EPA*, 549 U.S. 497, 525

---

[7] The closest Plaintiffs come is their allegation that 5A and 5B's child, 5C, once "ran away from home" at age 13. But Plaintiffs make no claim that 5C ran away to a licensed shelter, did so without parental permission, or is seeking or receiving gender-affirming care. *See* Wash. Rev. Code § 13.32A.082(1)(b)(i). In any event, the allegation that 5C ran away once is not sufficient to suggest that 5C will do so again in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("That Lyons may have been illegally choked by the police . . . does nothing to establish a real and immediate threat that he would again be stopped . . . by an officer or officers who would illegally choke him into unconsciousness[.]").

n.23 (2007) (quoting *Village of Elk Grove Village v. Evans*, 997 F.3d 328, 329 (7th Cir. 1993)).

We agree that, in light of the "probabilistic" nature of the injury-in-fact requirement, *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc)), "increased . . . risk of future harm" may be sufficient to confer standing, *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010). *See Covington v. Jefferson Cnty.*, 358 F.3d 626, 638 n.15 (9th Cir. 2004). But Plaintiffs misstate the implications of this principle. Although probabilistic harm can create standing, it does not replace the foundational rule that a future injury must be imminent in order to satisfy the injury-in-fact requirement. *Lujan*, 504 U.S. at 564 n.2. The notion of probabilistic harm merely recognizes that a plaintiff may reach that bar by showing that his likelihood of harm has significantly increased, bringing his potential for injury from certainly imaginable to "certainly impending." *Clapper*, 568 U.S. at 414; *see, e.g.*, *Krottner*, 628 F.3d at 1143 (plaintiffs' "increased [] risk of future harm" created a "credible threat of real and immediate harm" that was sufficient to create standing); *Covington*, 358 F.3d at 641 (same); *Nat. Res. Def. Council v. U.S. EPA*, 735 F.3d 873, 878–79 (9th Cir. 2013) (same); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) (same). For the aforementioned reasons, Plaintiffs have not made that showing here.

Plaintiffs also argue that they need not demonstrate a high likelihood of impending injury because the potential injuries they face are "drastic." In support of this argument, Plaintiffs quote *Massachusetts* for the proposition that "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability to establish

standing." 549 U.S. at 525 n.23 (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996)). Yet Plaintiffs miscast the context of this comment, which arose in a discussion about the redressability requirement, not the injury-in-fact requirement. Specifically, in *Massachusetts*, the defendant agency had argued that the plaintiff states could not demonstrate redressability because the regulation they challenged "contribute[d] so insignificantly to [their] injuries that the Agency [could] not be haled into federal court to answer for them." *Id.* at 523. The Supreme Court relied on the severity of the states' injuries only in rejecting this specific argument. *Id.* It reasoned that, although vacating the regulation might not fully redress the states' injuries, the "potential consequences" it presented were so drastic that it was worth litigating the issue. *Id.* at 525 & n.3. That principle has no bearing on the question here—whether Plaintiffs have demonstrated an adequate injury in fact based on future injuries.

Plaintiffs finally attempt an analogy to pre-enforcement standing injuries, but this argument is also unavailing. Article III standing in the pre-enforcement context arises when an individual is subject to a credible threat of government action. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). When the threatened enforcement is sufficiently imminent, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.* But Plaintiffs concede that this concept is not directly applicable here. Moreover, standing in pre-enforcement cases still requires "circumstances that render the threatened enforcement sufficiently imminent." *Id.* at 159; *see also Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018). Because Plaintiffs have not demonstrated that

their injuries are imminent, their self-described "analog[y]" to pre-enforcement cases does not help their cause.

## III.  The Organizational Plaintiffs Lack Standing.

In the alternative, Plaintiffs argue that IPEC, one of the two Organizational Plaintiff, has standing to pursue its claims.    Plaintiffs specifically contend that IPEC has associational standing because it has one member who is a Washington resident with custody of a gender-dysphoric minor.    Plaintiffs do not contend that IPEC has organizational standing on its own behalf, and they offer no assertion that APC, the other Organizational Plaintiff, has any type of standing.

Associational standing is a form of derivative standing that allows an organization to bring suit on behalf of its members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).  An organization has associational standing to bring suit (1) "when its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

IPEC does not satisfy this standard.  As noted, IPEC claims standing based on the alleged injury suffered by one of its members, who is "a Washington parent with custody of a minor child who has struggled with gender dysphoria." But this individual IPEC member lacks standing for the same reasons as the Individual Plaintiffs: He or she has not suffered a cognizable current injury, and the FAC fails to

offer allegations showing that a future injury is certainly impending. Therefore, because IPEC has not demonstrated that its individual members have standing to sue, its claim to associational standing fails at the first step. *See Friends of the Earth*, 528 U.S. at 181; *see, e.g.*, *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1255–57 (9th Cir. 2010) (finding an organization lacked associational standing where its member had not demonstrated a sufficiently specific injury in fact).

## CONCLUSION

For the foregoing reasons, we conclude that Plaintiffs have not demonstrated standing to bring their claims. Because none of the Individual Plaintiffs has alleged a cognizable injury that is presently being suffered, Plaintiffs lack standing on the basis of current injuries. Further, because none of the Individual Plaintiffs has alleged sufficient facts to make out a clearly impending injury, Plaintiffs also lack standing on the basis of future injuries. IPEC lacks associational standing for the same reasons. As a result, we agree with the district court that Plaintiffs have failed to demonstrate standing under Article III, and we affirm the dismissal of their action.

**AFFIRMED.**